IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 1:13-CR-310 |
| | ) | |
| OMAR FABIAN VALDES GUALTERO, | ) | The Honorable Gerald Bruce Lee |
| | ) | |
| Also known as "Gordo," | ) | Sentencing Date: April 13, 2015 |
| | ) | |
| Defendant. | ) | |

**MOTION FOR ONE LEVEL REDUCTION PURSUANT TO U.S.S.G § 3E1.1(b) AND POSITION OF THE UNITED STATES WITH RESPECT TO SENTENCING**

The United States of America, in accordance with the United States Sentencing Commission, *Guidelines Manual*, § 6A1.2 and the policy of this Court, files its position on the sentencing of the defendant, OMAR FABIAN VALDES GUALTERO, also known as "Gordo." The United States moves for a one-level reduction of the defendant's Sentencing Guidelines level pursuant to U.S.S.G § 3E1.1(b) in recognition of the defendant's timely guilty plea. The government has reviewed the Presentence Investigation Report ("PSR") and concurs with the findings of the Probation Office that the applicable Sentencing Guidelines range is life in prison. Based on the nature and circumstances of the offense, the defendant's leadership role in the criminal organization responsible for the murder of DEA Special Agent James "Terry" Watson, and the defendant's history and characteristics, the United States respectfully submits that a sentence of 60 years of incarceration is appropriate in this case and accounts for each of the factors set forth in Title 18, United States Code, Section 3553(a).[1]

---

[1] Although the applicable U.S. Sentencing Guidelines range calls for a sentence of life in prison; consistent with the U.S. government's extradition agreement with the Republic of Colombia, the

1

I.  **Procedural Background**

On December 19, 2015, the defendant pleaded guilty pursuant to a plea agreement to Count One and Count Three of the Indictment charging him with aiding and abetting the murder of an internationally protected person, in violation of Title 18, United States Code, Sections 1116(a) and 2, and conspiracy to kidnap an internationally protected person, in violation of Title 18, United States Code, Section 1201(c). Thereafter, the remaining counts of the Indictment were dismissed.

II. **Factual Background**

The following is a brief summary of the facts surrounding the DEA Special Agent James "Terry" Watson's murder, including information about the victim and the defendant's involvement in the victim's murder.

**A. The Victim, Special Agent James "Terry" Watson**

**"Terry was on the front line of stopping drugs from getting into our country and to our children." Paul Watson, Victim Impact Statement.**

Special Agent Terry Watson was a dedicated and long-standing public servant who devoted his entire adult life to protecting the public and the citizens of the United States. Prior to joining the DEA, Special Agent Terry Watson worked for the Richland Parish Louisiana Sheriff's Department, the U.S. Army National Guard and the U.S. Marshal's service. Thereafter, he joined the DEA. During his 13 years with the DEA, Special Agent Terry Watson stood on the front lines combating drugs, guns, and violence that threaten our country every day. He volunteered for dangerous assignments that took him all over the world including Honduras

---

U.S. government will not be seeking a sentence of life in prison. Instead, the U.S. government is seeking a sentence for a term of years. Specifically, the U.S. government is seeking a term of 60 years' imprisonment.

Haiti, Panama, Guatemala, and Colombia. In addition, he was deployed on three separate occasions to Afghanistan.

In July 2010, Special Agent Terry Watson was assigned to DEA's Cartagena, Colombia Resident Office. In his position, he was also designated as an Assistant Attaché for the United States and was an internationally protected person. At time of his death, he was working on a number of large-scale narco-trafficking matters, including one case that was resolved shortly after his death that involved the seizure of approximately 20,000 kilograms of cocaine, 15 go-fast vessels, and the arrest of approximately 50 individuals.

As his colleagues have described, he was the type of agent who was the first to arrive in the morning and the last to leave at night. He was hard working, smart, and humble – he was a leader and a mentor to many of his fellow agents. Not surprisingly, the night of his death, Special Agent Terry Watson was busy throughout dinner talking and texting with his colleagues to keep track of an ongoing DEA operation.

At the time of his death, he was a 42-year-old, recently married man, who was a 13-year veteran of the DEA. He lived with his wife of four months, Fadia De La Rosa Watson. He was the youngest son of Henrietta and Paul Watson and brother to Scott Watson. As his wife and parents have stated, the loss of Terry has been devastating, it has caused countless sleepless nights wrought with nightmares of Terry's murder, and their existence does not have space for all the pain they still feel about Terry's death. It should also be noted that the death of the victim has been felt not only by his family, but has reverberated throughout the DEA family, the United States Embassy in Bogotá, Colombia, and the law enforcement community.

**B. The Conspiracy to Commit "Millionaire's Ride Robberies"**

The defendant was the leader of an organized group that conducted "Millionaire's Ride" robberies. This group was in operation, in one combination or another, over an extended period of time. These robberies required organization and a clear division of labor. The group typically used three taxis, and each conspirator played a specific role. Investigation has identified multiple prior victims, all of whom were merely seeking to use the services of a taxi cab to get around the city of Bogotá. In addition to organization, these robberies also required a level of betrayal of trust and brutality, as described by prior robbery victims whom these defendants allowed to live. All of these victims were threatened, terrified and left with scars – the lucky ones have scars that are mental. Other victims, as further described below, were left with physical scars. As evidenced by the actions of the defendants during the kidnapping and robbery of Special Agent Terry Watson, these defendants were willing to disregard the value of human life in exchange for the content of their victims' pockets and bank accounts.

**C. The Kidnapping and Robbery of Special Agent James "Terry" Watson**

On or about June 20, 2013, the defendant and Edwin Gerardo Figueroa Sepulveda ("Figueroa Sepulveda"), Hector Leonardo Lopez ("Lopez"), Edgar Javier Bello Murillo ("Bello Murillo"), Andres Oviedo-Garcia ("Oviedo-Garcia"), and Julio Estiven Gracia-Ramirez ("Gracia Ramirez") met to coordinate and conduct millionaire rides. As discussed above, the scheme typically used three taxis and the defendant's role the night of the murder was to be a passenger in the follow-taxi and to pick up the victim's ATM and credit cards and use them at various banks.

Once the group met, they quickly proceeded to circle the city looking for potential victims. The second taxi encountered some mechanical issues and it was determined that Oviedo

Garcia would stay with that taxi to get it serviced and avoid any attention from law enforcement. Thereafter, the rest of the co-conspirators continued with the agreed plan but with two taxis rather than three.

At approximately 11:00 p.m., Special Agent Terry Watson left a restaurant in Bogotá, where he had been dining with DEA and international law enforcement colleagues. He hailed a taxi ("Taxi #1") in the Parque 93 area of Bogotá, a popular and affluent neighborhood known for high-end dining and shopping establishments. Defendant Gracia Ramirez drove Taxi #1. Once the victim entered Taxi #1, Gracia Ramirez engaged the victim in conversation in Spanish and determined that Special Agent Terry Watson was seeking a ride to the Marriott Hotel in Bogotá. As soon as Taxi #1 began to travel, a second taxi ("Taxi #2"), driven by Defendant Lopez, pulled up behind Taxi #1. Defendants Figueroa Sepulveda, Bello Murillo, and Valdes Gualtero were riding in Taxi #2.

After a short drive, Defendant Gracia Ramirez alerted the other defendants that Special Agent Terry Watson was to be their next robbery victim. As previously agreed, Defendant Gracia Ramirez alerted his co-defendants by pumping the brakes of his taxi to act as if it were experiencing engine trouble. Upon receiving the signal, Defendant Lopez confirmed his understanding of the plan by flashing the headlights of his car. Taxi #1 then came to a stop, and Taxi #2 pulled up directly behind it. Defendants Figueroa Sepulveda and Bello Murillo got out of the back seat of Taxi #2 and got into the back seat of Taxi #1, one on each side of Special Agent Terry Watson. Defendant Figueroa Sepulveda used a stun gun several times to attempt to incapacitate Special Agent Terry Watson. Special Agent Terry Watson struggled. During the struggle, Defendant Bello Murillo stabbed the victim several times with a knife.

5

Special Agent Terry Watson was able to break free, but collapsed a short distance from the crime scene. Colombian National Police officers arrived several minutes later. The police put the victim in their vehicle and took him to the hospital, where he was pronounced dead shortly thereafter. The cause of Special Agent Terry Watson's death was blood loss as a result of multiple stab wounds. The manner of death was homicide.

### D. The Victim's Injuries

During the kidnapping and robbery, the victim was hit with fists, shocked with a taser, and stabbed a total of four times. The victim was shocked with the taser approximately three to six times. Thereafter he was stabbed in the torso. At least two of his wounds were fatal, but it took him approximately an hour before he succumbed to his injuries. He was able to escape from the taxi and run approximately a half a block before he collapsed. He was able to speak initially, but by the time he was evaluated by emergency room personnel they were not able to detect a blood pressure, and he soon succumbed to his injuries which caused him to lose almost his entire blood volume.

### E. The Defendant's Leadership Role in Organizing the Members of the Conspiracy

The defendant was the leader of this group of co-conspirators. Consistent with the statements of several co-defendants, the defendant exhibited his leadership role in several ways, including: he contacted members of the group to get them to meet to carry out the millionaire's rides, he cajoled members to participate when they were reluctant, he ensured that weapons were available to be used, and he distributed disposal cell phones to the group to help avoid the co-conspirators' detection by local police. As a part of the conspiracy, defendant Valdes Gualtero also was the primary person who brought the victims' possessions to a third party to be sold and the defendant distributed the proceeds to the co-conspirators.

### F. History and Characteristics of the Defendant

As reflected in the PSR, the defendant is a disgraced, former police officer who resigned from the Colombian police department in Bogotá in 2010 after he was charged with aiding and abetting an armed robbery. The defendant's criminal activity was far from over after he left the police department. Rather, it appears the defendant decided to pursue a life of crime.

After he was arrested in this case, the defendant admitted to U.S. law enforcement officials that he participated in at least 5 to 10 millionaire's ride attacks prior to Special Agent Watson's murder. The defendant estimated that there had been approximately 20 to 30 victims. Further, the defendant admitted that during their crimes, they intimidated victims using physical violence and knives.

Indeed, Special Agent Watson's kidnapping and murder was not the defendant's first crime, first robbery, first kidnapping, or his first assault. The defendant's involvement in prior violent assaults was confirmed by his victims and by the defendant's co-conspirators. The following is a brief summary of just two of the prior robberies and assaults:

1.  Victim F advised U.S. law enforcement officials that on the evening of May 4, 2013, the defendant Valdes Gualtero stabbed her boyfriend while attempting to conduct a millionaire's ride. The victim reported that she and her boyfriend were picked up in a taxi in downtown Bogotá, Colombia at approximately 10:00 p.m. At some point after the victims entered the taxi, the driver stopped and two men, who the victim identified as Valdes Gualtero and Bello Murillo, approached the taxi. The victim's boyfriend attempted to stop the men from entering the car, but Valdes Gualtero slashed her boyfriend's face and stabbed her boyfriend in the chest with an unidentified sharp weapon. While this struggle occurred, defendant Bello Murillo entered into the back seat of the taxi with Victim F and held her by force using a sharp

7

object, which he stuck into her side.  After the struggle, Valdes Gualtero left the victim's boyfriend on the street, entered the taxi, and the taxi drove off with the victim still in the backseat.  Defendant Bello Murillo began to hit the victim on the head and groped her body for a phone, ATM cards, or other valuables.  Defendant Bello Murillo threatened to kill the victim if she did not provide her valuables and punched her in the face.  After the victim explained that she had given her purse to her boyfriend to hold for her, the assailants drove the victim around the city for some period of time.  The defendants stopped that taxi cab in a dangerous neighborhood in Bogotá, and defendant Bello Murillo dragged Victim F out of the taxi cab and forced her to kneel down on the street.  Victim F believed that she was going to be executed.  It was not until she heard the taxi's wheels spin on the road that she realized they had left her alive.

   2.  Victim D advised U.S. law enforcement officials that on June 5, 2013, during a millionaire's ride robbery, the defendant Valdes Gualtero repeatedly threatened to kill her, put her in a head lock, and physically assaulted her.  In addition, defendant Bello Murillo cut her several rimes with a sharp object. Further, during the attack, she was shown a bottle of acid and the assailants threatened to throw it in her face.  Victim D advised law enforcement that defendant Valdes Gualtero was the one giving commands during the assault and was the individual who "incited violence the most."  Ultimately, while Victim D was physically struggling with defendant Valdes Gualtero, she was able to pull the emergency brake of the taxi, which was moving at the time.  This resulted in another car rear-ending the taxi (the car that hit them was driven by defendant Oviedo-Garcia).  Notably, Valdes Gualtero admitted to U.S. law enforcement that he was involved in the assault and robbery of Victim D.  He also admitted that Bello Murillo was one of the assailants that entered the taxi and that Bello Murillo was carrying a knife when he got in the taxi.  This incident was further corroborated by defendant Oviedo-

Garcia who admitted that he was the driver of the taxi that rear-ended the taxi carrying Victim D, Valdes Gualtero, and Bello Murillo.

### III. Sentencing Standards

Although the Sentencing Guidelines are advisory, sentencing courts "must consult those Guidelines and take them into account when sentencing." *United States v. Booker*, 543 U.S. 220, 264 (2005). "[A] district court shall first calculate (after making the appropriate findings of fact) the range prescribed by the guidelines. Then, the court shall consider that range as well as other relevant factors set forth in the guidelines and those factors set forth in [18 U.S.C.] § 3553(a) before imposing the sentence." *United States v. Hughes*, 401 F.3d 540, 546 (4th Cir. 2005). Those factors include the nature and circumstances of the offense, the history and characteristics of the defendant, and the need for the sentence to promote respect for the law, provide just punishment, deter criminal conduct, protect the public, and avoid unwarranted sentencing disparities. 18 U.S.C. § 3553(a).

### IV. Sentencing Guidelines Calculation

The United States concurs in the Probation Office's Sentencing Guidelines calculation, with one exception: the defendant's Guidelines level should be enhanced by two levels pursuant to U.S.S.G. § 3C1.1 for obstructing or impeding the administration of justice. Pursuant to Section 3C1.1, there is a two-level enhancement where a defendant "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the . . . prosecution . . . of the instant offense of conviction," and "the obstructive conduct related to . . . the defendant's offense of conviction . . . ." U.S.S.G. § 3C1.1. Application Note 4(B) makes clear that committing perjury is squarely within the types of conduct to which this section applies. The Fourth Circuit has agreed. "Application of [§ 3C1.1] is appropriate if the

9

sentencing court finds that the defendant when testifying under oath (1) gave false testimony; (2) concerning a material matter; (3) with the willful intent to deceive (rather than as a result of confusion, mistake, or faulty memory)." *United States v. Quinn*, 359 F.3d 666, 681 (4th Cir. 2004) (internal quotation marks and citation omitted). The Fourth Circuit has specifically upheld the application of § 3C1.1 based on false testimony at a suppression hearing. *See United States v. Akinkoye*, 185 F.3d 192, 205 (4th Cir. 1999).

In the instant case, the defendant testified, under oath, during a hearing on October 6, 2014. During that testimony, the defendant provided perjured testimony regarding the circumstances of his questioning by U.S. law enforcement agents in Colombia. This perjured testimony included false claims that an agent carried a gun into the interrogation room and put it on a table, pointing it at the defendant, thereby intimidating him. This Court found the defendant's testimony to be incredible. *See* Memorandum Opinion and Order, Docket No. 212 at 11-12. This was certainly a material matter, as the defendant's false testimony, if believed, could have resulted in the suppression of statements with significant evidentiary value. Based on the above, the defendant's sentencing guidelines should be enhanced by two levels.

The Base Offense Level is 43. U.S.S.G. § 2X1.1(a). The defendant's Offense Level is increased by 4 levels as he was an organizer of the criminal activity which involved more than five participants. U.S.S.G. § 3B1.1(a). The Offense Level should be enhanced by an additional two levels pursuant to U.S.S.G. § 3C1.1, resulting in a total offense level of 49. The defendant has demonstrated acceptance of responsibility and has assisted law enforcement authorities in the investigation by timely notifying authorities of the intention to enter a plea of guilty. Accordingly, his offense level is decreased by a total of 3 levels. U.S.S.G. § 3E1.1(a) and (b).

Thus, his Total Offense Level is a 43.[2] The defendant's criminal history is a Category I. Accordingly, the Guidelines range is life in prison.

## V. Statutory Sentencing Factors

The government submits that a sentence of 60 years' imprisonment would be sufficient, but not greater than necessary, to account for the factors set forth in 18 U.S.C. § 3553(a), including: (A) the nature and circumstances of the offense, (B) the history and characteristics of the defendant, (C) the need to provide a just punishment for the crime and provide adequate deterrence for such conduct; and (D) the need to avoid unwarranted sentencing disparities.

### A. A Sentence of 60 Years Imprisonment is Reasonable and Appropriate Given the Nature and Circumstance of the Offense and the Defendant's Role in the Offense

There is no more serious crime than the taking of a human life. The circumstances of this crime involved the violent actions taken by the defendant and his co-conspirators to cause the death of Special Agent Terry Watson. The horrific circumstances of this crime are compounded by the fact that this was not the first time the defendant and his co-conspirators set out to kidnap and harm a helpless victim. Unfortunately, on this occasion, the escalating violence exhibited by the defendants resulted in the death of one of their victims.

The defendant played a leadership role in this organization. The defendant purchased and provided the stun gun that was used to help incapacitated the victim and he organized the group knowing that they would use force and/or threats of force to subdue any unsuspecting victim that was selected the night of Special Agent Watson's murder. When considering the defendant's role in the offense, the Court should conclude that his participation was critical to the events of June 20, 2013. While he was not personally involved in a "hands-on" fashion in the assault that

---

[2] The Total Offense Level calculation is a 46; however, consistent with the Sentence Guidelines, Chapter 5, Part A, Application Note 2, an offense level of more than 43 is to be treated as an offense level 43.

11

led to Special Agent Terry Watson's death, the defendant's actions that night clearly indicate that this defendant intended for the group's victim to face fear, intimidation, and physical violence, if necessary. That one of his conspirators stabbed the victim can be no surprise to the defendant, given the manner and means of what he and the others used in the past. The recommended sentence reflects the circumstances of the offense and the role that the defendant played.

> **B. A Sentence of 60 Years' Imprisonment is Reasonable and Appropriate Given the History and Characteristics of the Defendant**

Consistent with 18 U.S.C. § 3553(a)(1), it is appropriate for the Court to consider the history and characteristics of the defendant when imposing a sentence. When evaluating the defendant's history and characteristics, there are no limits on "the information concerning the background, character, and conduct" of a convicted defendant that the district court may consider in determining an appropriate sentence. 18 U.S.C. § 3661 (2006). Ultimately, a district court can consider facts that it finds by a preponderance of the evidence. *See United States v. Grubbs*, 585 F.3d 793, 798–99 (4th Cir. 2009).

As outlined above, the defendant is a former Colombian police officer who had to resign in disgrace after being implicated in an armed robbery. This occurred in approximately 2010. This is relevant not only because it reflects on the type of person the defendant is, but also the lengthy amount of time during which he has been committing crimes.

Furthermore, the defendant's involvement in orchestrating millionaire's rides is significant and uncontroverted as the defendant, himself, has admitted his involvement in the kidnapping and robbery of at least 20-30 victims. What the defendant did not admit, but has been reported by multiple victims and corroborated by co-conspirators, is that the defendant is a vicious, violent criminal. He slashed and stabbed one victim a mere 6 weeks prior to Special

Agent Watson's murder and he put another victim, a woman, in a headlock and repeatedly threatened to kill her while a co-conspirator cut her with a sharp object. There is little doubt that, but for his arrest in this case, the defendant would have continued to kidnap, rob, and assault unsuspecting victims and his dangerousness likely would have continued to escalate. Accordingly, the government respectfully submits that it is appropriate for the Court to consider the defendant's violent tendencies and proclivity for committing crimes in meting out a sentence in this case.

### C. A Sentence of 60 Years Imprisonment is a Just Punishment and Provides Adequate Deterrence

A guidelines sentence will deter the defendant and others from similar acts and is just punishment for the offense. Prior to Special Agent Terry Watson's murder, "millionaire ride" robberies were ubiquitous in Bogotá. The term "paseo millonaire" was a common term and U.S. employees traveling to the United States were briefed on them as a possible threat. The victim's murder in this case placed these types of crimes on the front page of the newspapers and television reports for weeks. Indeed, this case continues to generate substantial interest from the Colombia media. The sentence imposed in this case must stand as a beacon to those who would commit this type of offense, either domestically or abroad. A sentence that is significant and lengthy for the leader of the group will send a clear message to criminals at home in Colombia (who are keenly aware of this case) that harsh sentences await if they purposefully (or accidently) target a United States citizen for one of their crimes.

The imposition of a guidelines sentence also is a just punishment. The defendant orchestrated this kidnapping and murder. Although the defense is sure to argue that he should not be judged harshly because he purchased a stun gun and acid spray to help avoid the use of a

knife, this is does not lessen his responsibility nor is it credible for him to claim that he did not think anyone would carry a knife. First, a stun gun can cause serious bodily harm and it was the defendant's intention that it would be used. Second, the defendant knew that knives had been used in the past (indeed, he had used dangerous objects himself to stab a prior victim) and he certainly could have reasonably foreseen that one (or more) of the co-conspirators would have knives with them the night of Special Agent Watson's murder. Ultimately, the defendant chose to not only participate in the millionaire's ride, but also to bring weapons and provide them to his co-conspirators. A sentence of 60 years imprisonment is a just punishment for someone who decided to lead a group of individuals who engaged in the type of criminal activity that resulted in Special Agent Terry Watson's death.

### D. Sentencing the Defendant to 60 Years' Imprisonment Will Avoid Unwarranted Sentencing Disparities

The recommended sentence is in line with sentences imposed in other federal cases involving the kidnapping and murder of law enforcement agents. In the Fourth Circuit, district courts most often impose life sentences on those defendants that murder law enforcement agents or federal employees. *See*, *e.g.*, *United States v. Locust*, 95 F. App'x 507 (4th Cir. 2004)(unpublished)(first degree murder of Park Ranger, resulting in a life sentence); *United States v. Nance*, 67 F.3d 298 (4th Cir. 1995)(first degree murder of Postal Service Employee, resulting in sentence of life in prison); *Schoppel v. United States*, 270 F.2d 413 (4th Cir. 1959)(second degree murder of a guard at Lorton reformatory, resulting in life in prison for two defendants).

A review of cases from other circuits reveal similar results, with sentences ranging from 25 years to life. *See*, *e.g.*, *United States v. Clemons*, 32 F.3d 1504 (11th Cir. 1994)(DEA agent

murdered during carjacking, resulting in life in prison); *United States v. Lopez-Alvarez*, 970 F.2d 583 (9th Cir. 1992)(murder and kidnapping of DEA agent and informant, resulting in life sentence); *United States v. Alvarez*, 755 F.2d 830 (11th Cir. 1985)(ATF undercover agents murdered, three defendants convicted of second degree murder and sentenced to 30, 25 and 22 years in prison). The requested sentence here is consistent with those imposed in other cases, while taking into consideration the defendant's role in the offense.

**VI. Conclusion**

For the reasons set forth above, the United States respectfully submits that a sentence of 60 years' imprisonment is warranted and just.

Respectfully submitted,

| | |
|---|---|
| Dana J. Boente | Leslie R. Caldwell |
| United States Attorney | Assistant Attorney General |
| | Criminal Division |

By: \_\_/s/_____ By: \_\_/s/_____
Michael P. Ben'Ary    Stacey Luck
Assistant United States Attorney    Special Counsel
United States Attorney's Office    Human Rights and Special Prosecutions Section
2100 Jamieson Avenue    Criminal Division, U.S. Department of Justice
Alexandria, VA 22314    1301 New York Ave., N.W.
Phone: (703) 299-3700    Washington, D.C. 20005
Fax: (703) 299-3980    Phone: (202) 514-5650
michael.ben'ary2@usdoj.gov    stacey.luck@usdoj.gov

## CERTIFICATE OF SERVICE

       I hereby certify that on the 6th day of April, 2015, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to the counsel of record.

                                              _____/s_____
                                              Stacey Luck
                                              Special Counsel
                                              Human Rights and Special Prosecutions Section
                                              Criminal Division, U.S. Department of Justice
                                              1301 New York Ave., N.W.
                                              Washington, D.C. 20005
                                              Phone: (202) 514-5650
                                              stacey.luck@usdoj.gov